IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



**FILED**

MAR 1 8 2026

CLERK, U.S. DISTRICT COURT
TEXAS EASTERN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | Case No. 4:26-CR-_____58_____ |
| | § | |
| | § | JDK / JDL |
| KRISTINE MICHELLE HICKS | § | |

## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### INTRODUCTION

1.      In or around January 2026, the U.S. Department of Agriculture, Office of Inspector General (USDA-OIG), and Animal & Plant Health Inspection Service (APHIS) Animal Care (AC), initiated an investigation into possible violations of the Animal Welfare Act Standards and Regulations.  The USDA-OIG is responsible for conducting investigations involving fraud, waste, and abuse in the programs and operations of the USDA.  This investigation involved **Kristine Michelle Hicks**, sole owner and operator of an unlicensed dog breeding and dog sale business, called "Giant German Shepherds," in Hopkins County, Texas, located in the Eastern District of Texas.  This investigation was initiated after a video circulated online of **Hicks**, in or around December 2025, tying a German shepherd dog, named Kerra, to a tree and shooting her three times, over the course of approximately one minute and thirty seconds.  Kerra died after **Hicks** shot her.

2.      Search warrants executed at **Hicks'** German shepherd breeding operation on January 10, 2026, resulted in the eventual surrender and transport of approximately 88 German shepherds.  There had been the month prior, in late December 2025,

Kristine Michelle Hicks Indictment—Page 1

approximately 131 German shepherds on **Hicks'** property, but **Hicks** on her own moved German shepherds from her property to another location.  Various animal care agencies were employed to care for the surrendered 88 German shepherds encountered on January 10, 2026.  A forensic veterinarian examined 56 German shepherds, surrendered to one of the animal care agencies, and determined that many of these German shepherds required emergency intervention.  The dogs had lacked adequate shelter from environmental exposure in their pens.  Their pens, dirt and mud filled, had rusty buckets clipped to fences in a crowded row that were supposed to be the dogs' source of food.  A few had some kibble in the bottom, but many were empty, and water containers had mostly dirty water in them.





3.      Multiple dogs had bite wounds and scars on their faces, legs, and some were missing parts of their ears.  Dogs had caked feces on their haircoats and feet.  Upon intake to the animal care agency, the dogs were vaccinated, provided basic deworming medication, and were each given their own crate and bed.  After two to three days most of the adult dogs were able to be approached for medical examinations.  Most of the dogs had diarrhea, some bloody and fecal diagnostics showed the dogs to be ladened with the intestinal parasites, hookworms, whipworms, and coccidia.  Approximately four of the adult dogs were diagnosed with heartworms caused by low albumin due to the level of parasitism and an inadequate diet.  Most of the dogs had fleas.  An older female dog, with

multiple bite lacerations on her right inner thigh, also had bloody diarrhea, bloody urine with clots, a severe urinary tract infection with urine that presented struvite crystals.

4.    The Purina Body Condition System is a nine-point, veterinarian-adopted tool designed to assess a pet's body fat levels.  On the scale of nine points, one point is emaciated, four to five points are ideal, and nine points is obese.  The body condition score of the adults had an average score of approximately 2.6 due in part to a lack of food and being burdened with parasites.

## COUNT 1

Violation: 7 U.S.C. § 2149 (Acting as an animal dealer without a license)

## LEGAL BACKGROUND

5.    Paragraphs 1-4 of this Indictment are hereby incorporated by reference, as through fully set forth herein.

6.    The Animal Welfare Act ("AWA"), 7 U.S.C. §§ 2131-2157, was enacted to ensure that pets are provided with humane care and treatment and are transported in a humane manner.  The AWA provides standards and licensing requirements for individuals who are dealers of animals, including those individuals who, in interstate commerce, buy, sell, or negotiate the purchase or sale of dogs.  Under the terms of the AWA, in order to engage in these activities, a dealer is generally required to have a license issued by the U.S. Department of Agriculture.  The U.S. Department of Agriculture has promulgated detailed regulations concerning the housing, treatment, and

sale of animals by dealers, to ensure that the animals are humanely treated by individuals involved in the breeding, sale, and transportation of dogs.

7.    The AWA is administered by the Secretary of Agriculture or his representative. 7 U.S.C. § 2132(b).  The AWA authorizes the Secretary to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. § 2151. The Secretary has delegated his authority to the APHIS Administrator.  APHIS's Animal Care inspectors conduct inspections of facilities to determine compliance with the AWA and its implementing regulations and standards.

8.    The AWA defines a "dealer" as "any person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of, (1) any dog … [for] … use as a pet." 7 U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1 (definition of dealer).

9.    Anyone who falls within the statutory definition of a dealer must obtain and maintain a valid license from the Secretary. 7 U.S.C. § 2134; *see also* 9 C.F.R. § 2.1(a)(1) (licensing requirements).  No dealer shall sell or offer to sell or transport or offer for transport in commerce any animal for use as a pet unless the dealer has a valid AWA dealer license.

10.    The Secretary has promulgated regulations and standards to govern the humane handling, care, treatment, and transportation by dealers, which includes the minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extreme weather and temperatures, adequate veterinary care, and separation

Kristine Michelle Hicks Indictment—Page 5

by species. 7 U.S.C. § 2143(a)(1)-(a)(2)(A). Dealers must comply in all respects with the regulations and standards for the humane handling, care, treatment, and transportation of cats and dogs.

## OPERATING AS AN UNLICENSED DEALER OF ANIMALS

11. From in or around June, 2024, and continuing through in or around December 2025, **Kristine Michelle Hicks** did knowingly violate 7 U.S.C. § 2134, in that she did then and there, while acting as a dealer of animals as that term is defined in 7 U.S.C. § 2132, sell and offer to sell, transport, and offer to transport, in commerce for use as a pet, a dog, without first obtaining a license from the Secretary of the Department of Agriculture.

All in violation of 7 U.S.C. § 2149.

## COUNTS 2-5

<u>Violation</u>: 18 U.S.C. § 1343
(Wire Fraud)

12. Paragraphs 1-4 of this Indictment are hereby incorporated by reference, as through fully set forth herein.

### General Allegations

At all times material to the facts set forth in this Indictment:

13. The defendant, **Kristine Michelle Hicks**, was an individual residing and operating a dog breeding and dog sale business in Hopkins County, Texas, in the Eastern District of Texas.

14. Zelle was a money-transfer feature offered by various financial institutions enabling users to send and receive payments from one financial institution account to

Kristine Michelle Hicks Indictment—Page 6

another, including by means of interstate transmission, and was used by **Hicks** in furtherance of her dog breeding and dog sale business.

15.    Facebook was a social media platform that enabled users to post information about themselves, their business activities, and other topics, and included a direct message feature that allowed users of the application to send messages to one another, including interstate transmissions.

16.    The American Kennel Club (AKC) is a nonprofit organization that maintains a registry of animals to promote the sport of purebred dogs and breeding for type and function.  Dog owners with animals meeting certain criteria are able to register their animals with the AKC.  AKC promulgates rules governing the eligibility of individual dogs or litters for AKC registration.  In general, a litter is eligible for AKC registration only if it is produced by the mating of AKC-registered parents of the same breed and is whelped in the United States.

## The Scheme to Defraud

17.    From in or around June, 2024, and continuing through in or around December 2025, in the Eastern District of Texas and elsewhere, the defendant, **Kristine Michelle Hicks**, knowingly devised and intended to devise a scheme and artifice to defraud and to unlawfully obtain money and property by means of false and fraudulent material pretenses, false and fraudulent material representations, and false and fraudulent material promises, and during the course of the scheme, **Hicks** transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and

artifice to defraud and for obtaining money and property by means of false and fraudulent

pretenses, representations, and promises, and **Hicks** acted with specific intent to defraud.

The general purpose of the scheme was to obtain money and property under the

ownership and control of other individuals, and to unlawfully and unjustly enrich herself

by obtaining the money and property of others by means of materially false and

fraudulent pretenses, representations, and promises.

## Manner and Means

18.     During the course of the scheme and artifice, **Hicks** ran a dog breeding and

sales business called "Giant German Shepherds."  In general, **Hicks** advertised dogs for

sale on a website that she controlled, www.GIANTGS.com.



19.    **Hicks** also advertised dogs and breeding services on a Facebook account for her business [phone number redacted].



20.    When **Hicks** received inquiries about dogs that she had advertised for sale, she made representations, statements, and promises about the dogs, including that they were healthy, that they had a certain specified parentage, and that they were registered with the AKC. **Hicks** also communicated with potential buyers using the direct

messaging feature of Facebook as well as text messages. Hicks' website, beyond showing photos of healthy German shepherds, included the following representations:

> Our breeding program is unique. Because we breed specifically for service dog placement (YES, we do sell to "regular" people.**[sic]**), our standards are very high. We are breeding life altering dogs, which is a task that we take very seriously. In order for a service dog to succeed, that dog must be calm, confident, intelligent, and people focused. Physically, that dog must have excellent structure, solid muscle tone, and be free from the physical issues that many German Shepherds now suffer from.

> Oddly enough, the very same traits that allow for service dog placement make phenomenal family pets for "regular" people. Dogs with a relaxed and confidant disposition. Affectionate, intelligent, and easy to train. Extremely focused on "their people". Healthy dogs, with a long lifespan. Appropriate protective instincts that provide the feeling of safety that people want.

> In order to provide all of this, we have put together a phenomenal group of dogs that we breed. All are AKC registered, which allows us to AKC register our puppies. All of our dogs are chosen for their temperaments, and their health test results, as well as our size requirements. We OFA certify both hips and elbows. Our dogs have OFA certs of either "good" or "excellent" and have elbows certs of "normal". All of our dogs test as completely clear of Degenerative Myelopathy, a crippling hereditary disease.

> We carefully pair our dogs, after all health clearances, based on temperament, size, color, and disposition to produce specific results.

21.    These representations, promises, and pretenses were false. Instead of selling purebred, properly AKC-registered, healthy animals, **Hicks** sometimes sold dogs that were a mix of breeds, were randomly sourced from other litters, and had diseases or were in an unhealthy state. **Hicks** also purchased litters or partial litters of German shepherd puppies that had been advertised on Facebook or advertised by other means, and then sold those puppies to unsuspecting buyers after **Hicks** falsely told them were

Kristine Michelle Hicks Indictment—Page 10

receiving pure bred, AKC-registered, healthy animals, born from specified parent animals at her dog breeding business, Giant German Shepherds.  As a result, **Hicks** sold animals with unknown genetic and behavioral traits as purportedly purebred German Shepherd Dogs, which have known genetic and behavioral traits that made them suitable for service dog placement.  **Hicks** also created and fabricated false AKC documentation to mislead and defraud buyers about some of the animals she sold.

22.     By doing this, **Hicks** was able to greatly inflate the sales price for the dogs, often by thousands of dollars above the dogs' real market value.

23.     In or around the Summer of 2024, a large number of German shepherd puppies died and began dying at the property where **Hicks** operated Giant German Shepherds.  **Hicks** sent a soil sample from the property to be tested.  The results of the soil sample revealed that the soil was contaminated with coccidia, an intestinal parasite.  After the coccidia was discovered on her property, **Hicks** purchased bulk bottles of Albon, an antibiotic used to treat coccidia, from Canada.  **Hicks** instructed her employees to give every puppy on her property, whether or not it was diagnosed with coccidia, a daily dose of Albon.  **Hicks** also required her employees to provide Albon to customers they delivered puppies to and tell them it was a "probiotic" to help with nervousness and stomach issues while they adjusted to their new homes.  The Albon, disguised as a "probiotic," was included in a stapled disposable bag along with other items provided to the customers through at least June 2025.

24.     In general, after **Hicks** and a buyer agreed to a sale for a dog, **Hicks** arranged for transfer of the animals by land or air carrier to states outside of Texas.  The

**Kristine Michelle Hicks Indictment—Page 11**

buyer paid **Hicks** an agreed sum for the dog by means of Zelle payments or other methods and would often pay costs of shipping, which together frequently totaled several thousand dollars.

### Victim – O.G.

25.    For example, as to Count 2 below, victim O.G. purchased her puppy, Zelda, from **Hicks** in or around the Fall of 2025 for $2500 ($500 deposit on October 22, 2025, and the remaining balance of $2000 on November 11, 2025). **Hicks** falsely represented to O.G. that Zelda was an AKC-registered German shepherd. In reality, Hicks purchased Zelda, along with four other German shepherd puppies, for $500 each from Individual 1, telling Individual 1 that she was involved in dog rescues and intended to train and then donate the puppies to police and fire rescue services. Subsequent DNA testing confirmed that Zelda was the offspring of German shepherd parents owned by Individual 1 that were not AKC-registered.

### Victim – M.I.

26.    As another example, as to Count 3 below, victim M.I. purchased his puppy, Raijin, from **Hicks** in or around the Spring of 2025 for $2500 ($500 deposit on April 28, 2025, and the remaining balance of $2000 in May of 2025). M.I, a disabled veteran, saved up his disability benefit payments to purchase Raijin from **Hicks** and told **Hicks** that he was a disabled Army veteran, paralyzed, bed-ridden, and wanted to replace his previous German shepherd that died in 2024. M.I. told **Hicks** that he needed a B-Type personality dog (friendly, slightly submissive, easy to train) that could be trained to be his service dog. **Hicks** told him some of her dogs were service dogs and had been used by

police departments due to their breeding history. M.I. reiterated to **Hicks** that he did not want an aggressive dog. M.I. texted pictures of his previous German shepherd to **Hicks** and told her it was trained to fetch M.I. drinks from the refrigerator, bring M.I. his clothes and shoes, and anything M.I. dropped, and help him when M.I. was in his wheelchair and at doctor appointments.

27. **Hicks** sent M.I. pictures of a blue (gray in color) puppy with blue eyes. **Hicks** told M.I. the blue German shepherd puppy with blue eyes was raised in her home, slept in her bed, and had the right temperament for what M.I. needed in a companion and service dog. **Hicks** told M.I. the dog was AKC-registered, and she would provide the paperwork at delivery of the puppy. Before Raijin was transported, M.I. reminded **Hicks** to include the AKC paperwork she promised, and **Hicks** told him that she would.

28. Raijin was transported via an employee of **Hicks** in or around May 2025 to M.I.'s son. The employee delivered Raijin along with an envelope containing documents. M.I.'s son brought M.I. the puppy and paperwork and M.I. immediately looked through the documents and noticed that the AKC paperwork was not included. M.I. texted **Hicks** and she said she would mail the AKC paperwork to him. M.I. followed up several times with **Hicks** trying to get the AKC paperwork, did not respond. Raijin also did not have blue eyes as promised by **Hicks** and was not blue but mostly black. More concerning was that Raijin did not have the disposition **Hicks** said he would. Raijin was extremely reactive, aggressive, and didn't understand the difference between play biting and hard biting. Raijin bit and drew blood on M.I. several times. When M.I. gave Raijin a bone he would growl and snap at M.I. if M.I. got near him. On

one occasion, Raijin aggressively bit M.I.'s arm and then lunged and bit M.I. in the face. Raijin has had medical issues incurring additional expenses, including skin issues on his chest and blood flow issues in his ears. Raijin is required to be muzzled at the veterinarian's office to prevent him from biting the employees. **Hicks** represented to M.I., through photographs, that Raijin's parents were particular and known German shepherd dogs. Subsequent DNA testing excluded these German shepherds from being Raijin's parents.

### Victim – R.B.

29.    As to Count 4 below, victim R.B. purchased his puppy, Mandy, from **Hicks** in or around the Fall of 2025 for $5600 ($1500 deposit on October 15, 2025, $1000 remaining balance on October 18, 2025, $1000 on October 20, 2025, for first payment of training program, $1000 on October 23, 2025 for second payment of training program, $1000 on October 24, 2025 for transportation of Mandy from Texas to New York, $100 on November 18, 2025, for remaining balance for transportation). R.B. found **Hicks** through a Facebook ad, and after making contact told **Hicks** that he was looking for a black and tan German shepherd. **Hicks** sent R.B. several pictures of dogs to choose from and R.B. chose Mandy from these pictures. In addition to the $2,500 R.B. paid for Mandy, he paid an additional $2,000 for training, to include basic obedience in the form of sit, stay, down, crate training, and walking on a leash without pulling. When R.B. received Mandy, she did not exhibit behavior of being trained. R.B. followed up with **Hicks** about the lack of training and **Hicks** was unresponsive, only stating that she would call R.B., but did not do so.

Kristine Michelle Hicks Indictment—Page 14

30.    **Hicks** provided R.B. with purported AKC paperwork that identified particular German shepherd dogs as Mandy's parents.  Subsequent DNA testing excluded Mandy from being the offspring of the claimed German shepherd mother.  Mandy's purported father could not be located for testing.

### Victim – K.T.

31.    As to Count 5 below, victim K.T. purchased her puppy, Hunter, from **Hicks** in or around December 2025 for $3000 ($1000 deposit on December 13, 2025, and the remaining balance of $2000 on December 15, 2025).  Due to losing three prior German shepherds to sickness, K.T. and her family decided that they would buy a German shepherd through a breeder so they would have more information about the dog's health history, background, and parentage.  Upon contacting **Hicks**, K.T. explained that she had prior German shepherds that became sick and died.  **Hicks** told K.T. that Hunter was from one of her litters and had been returned from a family after losing their home.  In addition to the general description of **Hicks'** German shepherd dogs on the Giant German Shepherds website, **Hicks** provided the following specific description of Hunter on the website:

> Meet Hunter, a charming nine-month-old intact black and red male German Shepherd with a heart full of love! This affectionate pup is not only kennel and house trained, he also knows his basic commands, and he thrives in the company of people of all ages. His favorite companions are children, with whom he shares an extra bond, always ready to play and share joyful moments.
>
> Hunter is a social butterfly who wants nothing more than to be right besides you, bringing warmth and companionship into your life. His playful spirit

and gentle demeanor make him the perfect family dog, eager to offer loyalty and affection. With his striking appearance and loving personality, Hunter is ready to find a forever home where he can continue to spread his joy and love. Are you ready to welcome this cuddly companion into your life?

Hunter's rehoming fee is $3500 with Full AKC Registration papers, $3000 with limited AKC Registration papers, & $2500 without AKC Registration papers.

32.     K.T. purchased Hunter with limited AKC registration paperwork as well as vaccination paperwork.  On or about Saturday, December 13, 2025, K.T. and her family drove approximately three hours towards **Hicks'** ranch.  About halfway there, an employee of **Hicks** texted K.T. and changed the meeting location to a park.  On or about Sunday, December 14, 2025, within 24 hours of bringing Hunter home, he began coughing and hacking.  By Tuesday, December 16, 2025, Hunter's symptoms had worsened significantly with a persistent cough, white discharge from his eyes, and he refused food and water.  K.T. took Hunter to an emergency veterinarian where he was diagnosed with kennel cough.  Hunter was brought home on Thursday, December 18, 2025, and taken to their local veterinarian for a follow up examination.  X-rays suggested possible pneumonia and K.T.'s veterinarian made an emergency referral to a specialty veterinary hospital.  At the hospital, Hunter was diagnosed with Parvovirus.  Doctors reviewed the vaccination records provided by **Hicks** to determine his medical history.  Due to questions about Hunter's vaccination status raised by doctors at this hospital, K.T. contacted both **Hicks** and **Hicks'** employee seeking any clarification that could assist in Hunter's treatment.  **Hicks** did not respond until two days later via text message with a

Kristine Michelle Hicks Indictment—Page 16

nonresponsive text message.  **Hicks** did not provide any additional medical history and represented that she had not seen this before in any of her dogs.  Hunter remained hospitalized from on or about December 19 to December 21, 2025.  The veterinarian reported Hunter's condition as grave and stated that if K.T. had not brought Hunter in right away, he likely would have died.  Due to Parvovirus protocols, K.T. and her family were not allowed to visit Hunter during his hospitalization.

33.    During Hunter's treatment, multiple veterinarians reviewed the vaccination records provided by **Hicks** and expressed concern about the accuracy of these records. They opined that if Hunter had actually received proper vaccinations, he likely would not have developed such a severe Parvovirus infection.  After Hunter was discharged from the animal hospital, K.T. brought him home, where he continued to experience vomiting and diarrhea.  A January 17, 2026, fecal panel was positive for hookworms and Giardia. Veterinarians stated the hookworm infection had likely been dormant due to the Parvovirus infection.  Follow up testing on February 9, 2026, showed Hunter's parasite levels had decreased but were still present.  A recheck on March 10, 2026, showed Giardia had cleared but hookworms were still present and required continued medication. Veterinary and medical expenses, at present, incurred by K.T. after bringing Hunter home total around $10,013.  **Hicks** provided K.T. with purported AKC paperwork identifying particular German shepherd dogs as Hunter's parents.  Subsequent DNA testing excluded these German shepherds from being Hunter's parents.

### Acts in Execution of the Scheme and Artifice

34.   On or about each of the dates set forth below, in the Eastern District of Texas and elsewhere, Defendant **Kristine Michelle Hicks**, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and unlawfully obtain money and property by means of false and fraudulent material pretenses, false and fraudulent material representations, and false and fraudulent material promises, knowingly transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce the writings, signs, signals, pictures, and sounds described below, and did so with specific intent to defraud:

| COUNT | DATE (ON OR ABOUT) | DESCRIPTION OF THE INTERSTATE WIRE TRANSMISSION |
|---|---|---|
| 2 | November 11, 2025 | $2000 remaining Balance via APPLE PAY payment to **Hicks** from victim O.G. |
| 3 | April 28, 2025 | $500 deposit via DISCOVER credit card direct pay through **Hicks'** website www.GIANTGS.com from victim M.I. |
| 4 | October 15, 2025 | $1500 deposit via CASH APP to **Hicks** from victim R.B. |
| 5 | December 15, 2025 | $2000 remaining balance via VENMO to employee of **Hicks** from victim K.T. |

All in violation of 18 U.S.C. § 1343.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
### Pursuant to 18 U.S.C. §§ 981, 982, and 28 U.S.C. § 2461

1.      The allegations contained in Counts 1 - 5 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981, 982, and 28 U.S.C. § 2461.

2.      Upon conviction of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 2-5 of this Indictment, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the defendant, **Kristine Michelle Hicks**, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, a money judgment.

3.      If any of the property described above, as a result of any act or omission of the defendant:

    a.  cannot be located upon the exercise of due diligence;
    b.  has been transferred or sold to, or deposited with, a third party;
    c.  has been placed beyond the jurisdiction of the court;
    d.  has been substantially diminished in value; or
    e.  has been commingled with other property which cannot be divided without difficulty,

then the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

Kristine Michelle Hicks Indictment—Page 19

A TRUE BILL

_____                _____3/18/26_____
GRAND JURY FOREPERSON              Date


JAY R. COMBS
UNITED STATES ATTORNEY


_____                _____3/18/26_____
BY: PAUL MORRIS                                Date
Assistant United States Attorney

Kristine Michelle Hicks Indictment—Page 20

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| V. | § § | Case No. 4:26-CR-_____ |
| KRISTINE MICHELLE HICKS | § § | |

## NOTICE OF PENALTIES

### Count 1

| | |
|---|---|
| Violation: | Violation: 7 U.S.C. § 2149 (Acting as an animal dealer without a license) |
| Penalty: | Imprisonment for a term of not more than one year, a fine of not more than $2,500, or both.  A term of supervised release of not more than one year in addition to such term of imprisonment. |
| Special Assessment: | $100.00 |

### Counts 2 – 5

| | |
|---|---|
| Violation: | 18 U.S.C. § 1343 (Wire Fraud) |
| Penalty: | Imprisonment for a term of not more than 20 years, a fine of not more than $250,000 or not more than the greater of twice the gross pecuniary gain or twice the gross loss from the offense, or both.  A term of supervised release of not more than three years in addition to such term of imprisonment. |
| Special Assessment: | $100.00 |

**Kristine Michelle Hicks Notice of Penalty**